<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
                                        :
TERRY SMITH,                            :
                                        :     Civil Action No. 3:17-cv-7978-BRM-LHG
                     Plaintiff,         :
                                        :
          v.                            :
                                        :
                                        :           **OPINION**
M&M MANAGEMENT CO.,                     :
                                        :
                     Defendant.         :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant M&M Management Co.'s, d/b/a Red, White & Blue Thrift

Stores ("M&M" or "Defendant") Motion for Summary Judgment. (ECF No. 13.) Plaintiff Terry

Smith ("Smith" or "Plaintiff") filed an Opposition to M&M's Motion for Summary Judgment

(ECF No. 15) and M&M filed a Reply Brief to Smith's Opposition. (ECF No. 18). Having

reviewed the submissions filed in connection with the motions and having declined to hold oral

argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and

for good cause shown, M&M's Motion for Summary Judgment is **DENIED**.

### I.     PROCEDURAL HISTORY

On August 29, 2017, Smith filed a Complaint (the "Complaint") in the Superior Court of

New Jersey, Mercer County against M&M alleging M&M violated the New Jersey Law Against

Discrimination, N.J.S.A. 10:5-12, *et seq.* ("NJLAD"), by discriminating against him on the basis

of his age when it discharged him. (Complaint (ECF No. 1-2).) On October 6, 2017, M&M

removed the matter to this Court asserting this Court's jurisdiction pursuant to 28 U.S.C. § 1332

based on diversity of citizenship of the parties. (ECF No. 1.) On October 13, 2017, M&M filed an Answer (the "Answer") to Smith's Complaint. (ECF No. 4.)

On June 22, 2018, M&M filed a Motion for Summary Judgment arguing that Smith cannot prove his age discrimination claim through either direct or circumstantial evidence. (ECF No. 13-2 at 14-26.) On July 23, 2018, Smith filed Opposition to M&M's Summary Judgment Motion asserting, *inter alia*, he has established a *prima facie case* of age discrimination and has adduced direct and circumstantial evidence of age discrimination thereby rendering summary judgment improper. (ECF No. 15 at 4-21.) On August 6, 2018, M&M filed a Reply Brief to Smith's Opposition. (ECF No. 18.)

## II.    FACTUAL BACKGROUND

M&M owns and operates thrift stores around the country in twenty-one separate locations. (ECF No. 13-1 ¶¶ 1-2; ECF No. 15-3 ¶¶ 1-2.) One of M&M's thrift shops is located at 2055 Nottingham Way, Trenton, New Jersey (the "Trenton Store"). (ECF No. 13-1 ¶ 3; ECF No. 15-3 ¶ 3.) The Trenton Store, as with every other M&M store, employs a fleet of truck drivers to collect donated customer goods for resale. (ECF No. 13-1 ¶ 4; ECF No. 15-3 ¶ 4.) The Trenton Store operates the largest fleets of trucks of all of M&M's locations. (ECF No. 13-1 ¶ 5; ECF No. 15-3 ¶ 5.)

M&M relies heavily on donations from the public in maintaining its operations. (ECF No. 13-1 ¶ 6; ECF No. 15-3 ¶ 6.)[1] M&M operates in a "competitive industry" and the survival of its business "depends on satisfied customers who continue to use M&M drivers to collect their donations." (ECF No. 13-1 ¶ 7; ECF No. 15-3 ¶ 7.) M&M competes with countless other

---

[1] In his deposition, Smith referred to donations as the "lifeblood of the company." (Smith Deposition (ECF No. 13-14, Ex. B) at 87:1-4.)

repositories for donated goods including various charities, places of worship, and direct competitors. (*Id.*) Thus, the company's trucking operations are vital to its business. (ECF No. 13-1 ¶ 8; ECF No. 15-3 ¶ 8.)

In 1994, M&M hired Smith as a truck driver for the Trenton Store at the age of thirty-eight. (ECF No. 13-1 ¶ 14; ECF No. 15-3 ¶ 14; ECF No. 13-14, Ex. B at 17:13-18.)[2] In early 2013, at the age of fifty-seven, Smith was promoted to the position of Transportation Supervisor. (ECF No. 13-1 ¶ 15; ECF No. 15-3 ¶ 15.) Robert Tucker ("Tucker"), M&M's National Supervisor, testified that he was responsible for Smith's promotion to the role of Transportation Supervisor. (Tucker Deposition (ECF No. 13-13, Ex. A) at 84:19-22.)[3] Tucker indicated that Smith was chosen for the job because, among other reasons, he had the requisite experience and was the "most qualified" for the position. (ECF No. 13-13, Ex. A at 47:14-21.) Smith testified he could not remember who promoted him, but that a co-worker named Jeff Chandler first "told [him] about the [open Transportation Supervisor] position." (ECF No. 13-14, Ex. B at 74:1-13.)

The role of Transportation Supervisor is "demanding" and "requires excellent

---

[2] M&M contends it provides each new employee with an Employee Handbook (the "Employee Handbook") containing the company's anti-discrimination policy, which reads:

> It is the policy of [M&M] to be in full compliance with all applicable laws prohibiting discrimination in employment. We will not discriminate against any employee or applicant because of race, color, creed, religion, sex, pregnancy, national origin, ancestry, age, disability, layoff, recall or termination.

(Employee Handbook (ECF No. 13-4, Ex. A) at 3.)

Smith maintains he did not receive the handbook M&M provided as Exhibit A, however, he signed an acknowledgement indicating he had received a copy of the Employee Handbook and understood the policies therein. (ECF No. 13-1 ¶ 13; ECF No. 15-3 ¶ 13.)

[3] As M&M's National Supervisor, Tucker was responsible for overseeing all of M&M's Transportation Supervisors. (ECF No. 13-13, Ex. A at 76:7-10.)

organizational and supervisory skills" as well as "the ability to manage M&M's extensive fleet of trucks and drivers at the Trenton Store." (ECF No. 13-1 ¶ 17; ECF No. 15-3 ¶ 17.) The responsibilities of the Transportation Supervisor include preparing and disseminating delivery routes, supervising truck drivers and head drivers, ensuring that drivers perform their delegated duties, addressing and remedying any issues that may arise with drivers, and ensuring that drivers meet the various company standards. (ECF No. 13-1 ¶ 18; ECF No. 15-3 ¶ 18.)

As National Supervisor, Tucker would make routine visits to M&M's locations nationwide, including the Trenton Store. (ECF No. 13-1 ¶ 22; ECF No. 15-3 ¶ 22.) In making visits to the Trenton Store, Tucker claims to have "observed numerous deficiencies with the Trenton Store's transportation operations following Smith's promotion to Transportation Supervisor." (Tucker Decl. (ECF No. 13-3) ¶ 15.) Specifically, Tucker claims he observed Smith failed to ensure that trucks underwent routine maintenance and failed to instruct and train drivers on how to correctly load and unload donations, thereby resulting in the mishandling and damaging of donations. (ECF No. 13-3 ¶¶ 16-17.)[4] However, Tucker testified that while he could not attribute the loss of donors and extraordinary vehicle expense M&M suffered directly to Smith's performance, Smith's staff underperformed in general. (ECF No. 13-13, Ex. A at 51:20-52:20.)

Tucker claims that M&M "became increasingly concerned about the number of customer complaints it received about the Trenton truck drivers under Smith's supervision." (ECF No. 13-3 ¶ 19.) Nevertheless, Tucker testified that he never told Smith his job was on the line or that he was likely to be fired or disciplined due to his performance. (ECF No. 13-13, Ex. A at 48:24-50:2.)

---

[4] Smith denies that Tucker observed any failure to ensure proper maintenance of the trucks or a failure to properly train drivers. (ECF No. 15-3 ¶¶ 23-25.) Moreover, Smith contends he only received only one formal evaluation during his employment at M&M, which took place in June 2004 and was satisfactory. (ECF No. 15-11, Ex. G.)

Rather, Tucker indicated that he merely told Smith "how serious these things were" and conceded that, upon each subsequent visit, he found Smith's performance to be improving. (*Id.*)

M&M maintains statistics to track customer complaints and compliments to determine, among other things, whether personnel are meeting expectations of the job, where additional training may be needed, and whether certain personnel should be recognized for excellent performance. (ECF No. 13-6, Ex. C.) M&M produced such records spanning from January 1, 2014 through May 2015. (*Id.*) Every month during that period, the Trenton Store consistently received the highest number of complaints about drivers and the lowest number of customer satisfaction reports. (ECF No. 13-14, Ex. B at 96:1-99:20.)[5] Tucker testified that, as a result, he would occasionally "coach" Smith regarding his problems with truck maintenance and ways to effectively oversee his drivers and their routes. (ECF No. 13-13, Ex. A at 39:22-41:12.)

In December 2013, Tucker had a meeting with Smith in which he outlined issues with the Trenton Store's transportation operations and provided specific guidance as to how to address these issues. (ECF No. 13-1 ¶ 29; ECF No. 15-3 ¶ 29.) Following the meeting, Tucker sent Smith a written summary of the discussion which included detailed instructions on actions Tucker recommended Smith should take. (ECF No. 13-1 ¶ 30; ECF No. 15-3 ¶ 30.)

M&M contends that, despite Tucker's best efforts to assist Smith in overseeing the Trenton Store, there were "no noticeable sustained improvement[s]." (ECF No. 13-13, Ex. A at 28:21-29:1.) Tucker claims he made "routine visits" to the Trenton Store and would implement procedures to increase driver efficiency, which Smith would invariably abandon. (ECF No. 13-3

---

[5] Smith mentions that this number may be skewed as the Trenton Store is by far the largest of M&M locations. (ECF No. 13-14, Ex. B at 96:1-99:20.) Additionally, Smith introduced evidence, in the form of e-mails between M&M employees, tending to demonstrate that drivers from other M&M locations may have inappropriately solicited positive customer feedback, thereby inflating their compliment totals. (ECF No. 15-12, Ex. H.)

¶ 24.) Smith denied there were any issues with his job performance or that he abandoned any changes recommended or implemented by Tucker. (ECF No. 15-3 ¶¶ 31-32.)

In September 2015, Smith was included in a phone conference with, among others, Stephanie Williams ("Williams"), a National Supervisor and one of Smith's direct superiors. (ECF No. 13-1 ¶ 33; ECF No. 15-3 ¶ 33.) M&M contends that, after the call ended, Smith referred to Williams as a "fucking bitch" and a "fucking jerkoff" in the presence of Rosalia Campos ("Campos"), the Trenton Store manager, Viviana Trejos ("Trejos"), the Trenton Store assistant manager, and Sharon McLaughlin, another M&M employee. (ECF No. 13-13, Ex. A at 110:6-13; ECF No. 13-3 at ¶ 26.)[6] Smith denies he made such comments. (ECF No. 15-3 ¶ 33; ECF No. 13-14, Ex. B at 118:3-119:7.)[7]

On October 20, 2015, Tucker terminated Smith and issued him an employee separation notice (the "Separation Notice"). (ECF No. 13-11, Ex. H.) Tucker maintains Smith was terminated due to poor performance and use of profane language toward a direct supervisor. (ECF No. 13-13, Ex. A at 28:3-29:9.)[8] The Separation Notice marked the boxes for "Substandard Work/Performance" and "Breach of Responsibilities" under "Nature of Violation(s)," but did not mark the box for "Misconduct." (ECF No. 13-11, Ex. H.) The Separation Notice also provided an

---

[6] Both Campos and Trejos were deposed in connection with this lawsuit. Campos testified that she did not recall exactly what Smith said, but believed she heard Smith refer to Williams as an "imbecile" and a "fucking jerk." (Campos Deposition (ECF No. 15-16, Ex. L at 30:2-31:20).) Meanwhile, Trejos testified that she heard Smith say "fucking bitch" and "some other things" in reference to Williams after he hung up the phone. (Trejos Deposition (ECF No. 15-17, Ex. M) at 19:5-20:22).)

[7] When asked during his deposition if he made the comments, Smith stated "[i]t doesn't sound like me, does it?" and later claimed "I don't recall saying that." (ECF No. 13-14, Ex. B at 118:3-16.)

[8] While M&M contends Smith was terminated, in part, due to his use of profane language towards a direct supervisor, the record indicates that Tucker knew about the alleged incident between Smith and Williams as early as September 10, 2015. (ECF No. 15-15, Ex. K.) Smith was not terminated until more than a month later, on October 20, 2015. (ECF No. 13-11, Ex. H.)

explanation for Smith's termination, which made no reference to the alleged comments Smith made toward Williams, stating:

> Failure to enforce and maintain company standards, including driver loading/unloading, cart loading, damages, scheduling, job assignments, merchandise left in trailers, cab conditions, truck maintenance, employee dress enforcement, drivers assisting each other, etc.

(ECF No. 13-11, Ex. H.)

Tucker testified that he did not include the incident between Smith and Williams on the Separation Notice because he "didn't think it was relevant to the performance issues that had [M&M] on the brink of triggering the separation." (ECF No. 13-13, Ex. A at 121:2-4.)

Smith contends that, approximately five weeks prior to his termination, Tucker made comments to him suggesting he was incapable of using and understanding new technologies being implemented by M&M and referring to him as a "dinosaur." (ECF No. 13-14, Ex. B at 5:22-9:24.) Smith further contends Tucker was intentionally "making [his] job difficult" in an effort to force him out, ostensibly due to poor job performance. (ECF No. 13-14, Ex. B at 6:10-11.) Smith testified, in pertinent part:

> Q: Mr. Smith, please tell me each and every fact you are relying on to support your allegation that you were discriminated against based on your age by my client [M&M]?
>
> A: Well, we implemented some new technology at our job and [Tucker] didn't think I would be capable of understanding and doing the new type of system that they were putting in place and referred to me as a dinosaur. Meaning that I was too old to comprehend the new technologies.
>
> Q: Okay. Why don't we list the facts, the alleged facts, and then we'll get to the who, what, where, when as we go. So is that one?
>
> A: Yes. He was making the job difficult and as far as increasing the workload of what I did. He brought somebody in that was younger than me and he told me that he was there to help me in my job

descriptions. And, in fact, he was actually the gentleman that I trained to replace me.

. . .

Q: What was the technology being introduced to the company?

A: It was a routing system that they implemented. We initially had it done individually. As drivers set up the routes, but they set up some new programs to do the routing of the pickups we would have each day, and we didn't understand a lot of the technology of how the routing was being done, and I asked if I could be trained in some way to, you know, so I could better perform my job, and I was told he was not going to provide any training for me.

. . .

A: . . . [This occurred p]robably around September. August or September [of 2015], yeah.

Q: This was a face-to-face conversation you had with Mr. Tucker? Over the phone? Via email? How did this conversation occur?

A: He told me in the back parking lot.

Q: The back parking lot of the Trenton Store?

A: Yeah. Just him and I.

(ECF No. 13-14, Ex. B at 5:22-9:24.)

Tucker denies he referred to Smith as a dinosaur "at any time during Smith's employment with [M&M]." (ECF No. 13-3 ¶ 29.)

Following Smith's termination, the Trenton Store's Assistant Supervisor, Scott Fitzpatrick ("Fitzpatrick"), assumed the role of Transportation Supervisor on an interim basis. (ECF No. 13-1 ¶ 39; ECF No. 15-3 ¶ 39.) Fitzpatrick was forty-five years old when he assumed the role. (*Id.*) In 2016, M&M hired Richard Carmichael, then age fifty-seven, as Transportation Supervisor of

the Trenton Store. (ECF No. 13-3 ¶ 31.)[9] M&M contends it hired Carmichael for the Transportation Supervisor position "before receiving notice of Smith's age discrimination claim." (ECF No. 13-3 ¶ 40.)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir.

---

[9] Notably, Tucker testified that M&M did not provide him with any age discrimination training in connection with his supervisory role, and that there was no "formal" training conducted by M&M "other than the issuing of the handbook that describes [M&M's] policies and procedures." (ECF No. 13-13, Ex. A at 65:7-67:5.)

1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV.  DECISION

The NJLAD prohibits age-based discrimination in employment decisions, stating in pertinent part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: . . . [f]or an employer, because of the race, creed, color, national origin, ancestry, [or] *age* . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . .

N.J. Stat. Ann. 10:5-12(a) (emphasis added).

In order to assert a successful termination claim under the NJLAD, a plaintiff has the burden of proving, by a preponderance of the evidence: (1) the plaintiff belongs to a protected class; (2) the plaintiff was performing adequately in his or her position; (3) the plaintiff was terminated; and (4) the employer replaced, or sought to replace, the plaintiff with a candidate "sufficiently younger to permit an inference of age discrimination." *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1145 (N.J. 2005); *Bergen Commer. Bank v. Sisler*, 723 A.2d 944, 959 (N.J. 1999). If the employer provides a non-discriminatory reason for the plaintiff's termination, the plaintiff cannot survive a summary judgment motion unless "he or she can 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Zive*, 867 A.2d at 1144 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). The non-moving party must

then "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' *Ezold* [*v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)]" and therefore "infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes*, 32 F.3d at 765 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).

It is well settled that state and federal courts interpreting the NJLAD look to federal law for guidance, specifically Title VII of the Civil Rights Act and the Age Discrimination in Employment Act of 1967 ("ADEA"). *See Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 911 (N.J. 1990) (holding that, when construing the terms of the NJLAD, courts frequently look to federal precedent governing Title VII of the Civil Rights Act of 1964 as a "key source of interpretive authority," and that substantive and procedural standards developed under the NJLAD "have been markedly influenced by the federal experience"); *see also Sisler*, 723 A.2d at 949 (when interpreting the NJLAD, New Jersey courts should look to federal cases arising under analogous provisions of Title VII of the Civil Rights Act of 1964 as well as the ADEA); *see also Shaner v. Horizon Bancorp.*, 561 A.2d 1130, 1133 (N.J. 1989) (approving of the use of "federal anti-discrimination statutes" in general, and Title VII in particular, when interpreting the NJLAD in an age-discrimination case); *see also Mancuso v. City of Atlantic City*, 193 F. Supp. 2d 789, 798 (D.N.J. 2002). Additionally, the Third Circuit has explicitly held that federal jurisprudence interpreting the ADEA, specifically *Hazen Paper v. Biggins*, 507 U.S. 604 (1993), applies to NJLAD cases. *Kelly v. Moser*, 348 F. App'x 746, 747 n.2 (3d Cir. 2009). Accordingly, this Court will look to federal case law concerning the ADEA and other analogous statutes containing anti-discrimination provisions for guidance.

In interpreting the elements of an age discrimination suit under federal law, courts have made it exceedingly clear that age *must* be the but-for cause of the employer's adverse action. *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 171 (2009) (holding that a plaintiff bringing an ADEA claim "must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action" and that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one of the motivating factors"); *see also Hazen Paper*, 507 U.S. at 609-10 (holding that in a disparate treatment case, there can be no liability unless the employer's protected trait, age, had a determinative influence on the negative employment decision).

M&M argues that Smith's age discrimination claim fails as a matter of law as Smith cannot prove his claim using either direct evidence, or circumstantial evidence of discrimination pursuant to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny. (ECF No. 13-2 at 14-25.) As such, M&M contends it is entitled to summary judgment. (*Id.*) Smith counters that he has adduced direct evidence of discrimination and has presented ample, circumstantial evidence from which a reasonable factfinder could disbelieve M&M's proffered grounds for his termination, thereby rendering summary judgment premature. (ECF No. 15-2 at 3-21.)

It is uncontroverted that Smith belonged to a protected class and that he was replaced by someone younger than him. (ECF No. 13-1 ¶ 15; ECF No. 15-3 ¶ 15; ECF No. 13-1 ¶ 39; ECF No. 15-3 ¶ 39). Accordingly, this Court will focus on whether Smith's age "played a role in the decision making process and . . . had a determinative influence on the outcome of that process." *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 363 (N.J. App. Div. 1997) (quoting *Miller v.*

*CIGNA Corp.*, 47 F.3d 586, 597 (3d Cir. 1995)).

### i.    Direct Evidence of Age Discrimination

"When an employee attempts to prove discrimination [under the NJLAD] by direct evidence, the quality of evidence required to survive a motion for summary judgment is that 'which if believed, proves the existence of a fact in issue without inference or presumption.'" *Sisler*, 723 A.2d at 954 (quoting *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n.13 (11th Cir. 1988)). Direct evidence must "demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Sisler*, 723 A.2d at 954 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). Furthermore, when a plaintiff alleging unlawful termination presents direct evidence that his or her age "was a substantial factor in the [termination] decision . . . the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered his age." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (citing *Price Waterhouse*, 490 U.S. at 265-66); *see also Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512-13 (3d Cir. 1997).

Smith points only to Tucker's comment that he was a "dinosaur" as direct evidence of age discrimination. (ECF No. 15-2 at 5-8.) This Court is unpersuaded that Tucker's single remark constitutes direct evidence of age discrimination in M&M's decision to terminate Smith. In interpreting the ADEA, the Third Circuit has held that a single, stray remark in which the plaintiff's direct supervisor referred to him as an "old man" did not constitute impermissible age discrimination. *Hyland v. Am. Intern. Grp.*, 360 Fed. App'x 365, 367 (3d Cir. 2010). Specifically, the *Hyland* court stated:

> We do not think that a single remark that might reflect the declarant's recognition of an employee's age in a context unrelated

to the employee's termination is sufficient evidence to support a *prima facie* case of age discrimination based on direct evidence at the time that the employer later terminates the employee. After all, whether or not a supervisor makes reference to an employee's age it is likely that he will have some concept of it. In any event, it would be unfortunate if the courts forced the adoption of an employment culture that required everyone in the structure to be so careful that every remark made every day passes the employment equivalent of being politically correct lest it be used later against the employer in litigation.

*Id.* at 367-68.

Here, as in *Hyland*, Tucker's single remark referring to Smith as a "dinosaur" does not constitute direct evidence of discrimination. *See also Geltzer v. Virtua W. Jersey Health Sys.*, 804 F. Supp. 2d 241, 249-50 (D.N.J. 2011) (holding that a remark that an employee did not "want" a full-time position because he was "getting old" did not constitute direct evidence of age discrimination pursuant to the ADEA or NJLAD). Smith has not proffered sufficient evidence to conclude the comment in question was made in a context related to Smith's termination. Although the comment may have been offensive, it constitutes circumstantial evidence at best. *Hyland*, 360 F. App'x at 367. Smith argues that this Court should not be persuaded by the holding in *Hyland* because the dinosaur comment was made "along with [] Tucker's refusal to provide training to [] Smith with respect to his expected ongoing job duties" and due to the "extremely close proximity in time between the dinosaur comment and the decision to terminate." (ECF No. 15-2 at 7.) However, the plaintiff in *Hyland* was terminated just a matter of months after his supervisor commented on his age, and the supervisor's comment in that case – that the plaintiff was the "old man of the operation" – is highly analogous to that in this case. *Id.*

Next, Smith contends this Court should rely on the Third Circuit's decision in *Fakete* as the comment at issue in *Fakete* is more analogous to Tucker's comment than that in *Hyland*. In *Fakete*, a supervisor who ultimately terminated the plaintiff remarked that the plaintiff "wouldn't

be happy [working for the employer] in the future" because they were "looking for younger single people." *Fakete*, 308 F.3d at 339.[10] The Third Circuit held that this single comment constituted direct evidence of age discrimination under the standard established in *Price Waterhouse* to allow the plaintiff to survive defendant's summary judgment motion. *Id.* at 340. Importantly, *Fakete* distinguished the comment made from those in several prior decisions in which the Third Circuit found that single remarks about a plaintiff's age did not constitute such evidence. *See Hook v. Ernst & Young*, 28 F.3d 366, 374-75 (holding that, to constitute direct evidence of age discrimination, the statement must "reflect a discriminatory or retaliatory animus" and this requirement is not satisfied where the conversation "had nothing to do" with the plaintiff's job or prospective termination); *see also Walden*, 126 F.3d at 516 (finding that direct evidence of discrimination did not exist where the comment was "vague and not specifically connected to any protected activity").

Here, Smith has not demonstrated a causal connection between Tucker's comment and the challenged employment decision. Unlike the comments in *Fakete* and *Rose*, Tucker's "dinosaur" comment was not made directly in the context of Smith's employment. Rather, by Smith's own description, it appears to be an imprudent, if not flippant, comment about Smith's age made in relation to his broader ability to understand certain technologies. Tucker's comment is certainly more analogous to the comments in *Hook* and *Walden* – which the Third Circuit concluded did not constitute direct evidence of discrimination – as this Court is satisfied it does not conclusively establish a discriminatory or retaliatory animus. For similar reasons, Smith's reliance on *Glanzman*

---

[10] Similarly, in *Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 158, 162 (2d Cir. 2001), the Second Circuit held that a supervisor's statement that he planned on replacing the plaintiff with someone "younger and cheaper" was sufficient to withstand defendant's summary judgment motion and shift the burden of persuasion under *Price Waterhouse*.

*v. Metropolitan Management Corp.*, 391 F.3d 506, 512 (3d Cir. 2004) is also misplaced.[11] Accordingly, Smith has not demonstrated direct evidence of age discrimination.

### ii.    Circumstantial Evidence of Age Discrimination

Second, M&M contends Smith cannot prove his case using circumstantial evidence under the framework established in *McDonnell Douglas* and its progeny. (ECF No. 13-2 at 16-25.) Specifically, M&M argues Smith cannot establish a *prima facie* case of discrimination, Smith cannot satisfy the burden shifting test in *McDonnell Douglas* because M&M had legitimate, non-discriminatory reasons for terminating him, and Smith cannot demonstrate M&M's "legitimate" reasons for terminating him were pretextual. (*Id.*) Smith counters that he has demonstrated circumstantial evidence of age discrimination as he has tendered evidence showing he was "actually performing his job" prior to his termination and can establish pretext through, *inter alia*, Tucker's ageist comment. (ECF No. 15-2 at 8-21.)

In order to establish a claim for age discrimination under the ADEA, or in this case, the NJLAD, "a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross*, 557 U.S. at 177-78. Under the framework established in *McDonnell Douglas* for evincing a circumstantial case, a plaintiff must first establish a *prima facie* case of age discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate that "(1) he was in a protected group; (2) he was performing his job at

---

[11] The *Glanzman* court held that a supervisor's comment that he "wanted to fire [the plaintiff] and replace her with an exceptionally endowed younger woman" constituted direct evidence of age discrimination, even though it was not made directly to the plaintiff. *Glanzman*, 391 F.3d at 513. Unlike here, the comment in *Glanzman* directly concerned the plaintiff's age in relation to her termination and was not "unrelated to the decisional process." *Id.* (citing *Price Waterhouse*, 490 U.S. at 277).

a level that met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) the employer sought someone to perform the same work after he left." *Buchholz v. Victor Printing, Inc.*, 877 F. Supp. 2d 180, 188 (D.N.J. 2012) (internal citations omitted); *see also Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007). If the plaintiff is able to establish a *prima facie* case,

> the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the prohibited conduct." [*DiFederico v. Rolm Co.*, 201 F.3d 200, 205 (3d Cir. 2000)]. If the employer satisfies its burden, then the plaintiffs must prove by a preponderance of the evidence that the reason articulated by the defendant is purely pretextual. *Id.* Once the defendant articulates such a reason, the plaintiffs must meet their "ultimate burden of persuasion." *Id.* at 206 (internal quotation marks and citation omitted). In order to meet this burden, plaintiffs must "either directly . . . persuad[e] the court that the discriminatory reason more likely motivated the employer or [indirectly persuade the court] by showing that the employer's proffered explanation is unworthy of credence." *Id.* (internal quotation marks and citation omitted). The pretext analysis focuses the court's attention on whether the defendant's proffered reason was the real reason for its decision. *Id.*

*Jakimas*, 485 F.3d at 785-86.

Smith has established a *prima facie* case of age discrimination. M&M concedes that Smith was a member of a protected group, Smith was fired, and it sought someone younger to perform the same work after he left, but argues his claim "fails as a matter of law because he cannot satisfy the second prong of his *prima facie* case regarding his performance." (ECF No. 13-2 at 18.) In support of this argument, M&M cites *Guarneri v. Buckeye Pipeline Services, Co.*, 205 F. Supp. 3d 606 (D.N.J. 2016). In *Guarneri*, the plaintiff brought an NJLAD claim that did not survive the defendant's summary judgment motion as the court determined "there were objectively clear and measurable inadequacies in Plaintiff's performance that are not contradicted by inadequacies in the record." *Id.* at 616. Specifically, the court highlighted that the plaintiff had a "prolonged failure

to bring in new business," failed to submit required sales reports and return his supervisor's calls, and did not maintain effective communication with customer accounts. *Id.* Importantly, the court noted "such performance measures can be concretely measured and tracked" in distinguishing such evidence from "subjective" work evaluations that may be "open to broad interpretation," such as effort or initiative. *Id.* (citing *Weldon v. Kraft*, 896 F.2d 793, 799 (3d Cir. 1990)).

The decision in *Guarneri* does not provide persuasive support to M&M's position. The *Guarneri* court specifically held that a defendant moving for summary judgment is "required to do more than provide mere allegations that [a] Plaintiff's performance was inadequate in order to defeat the discrimination claim at the prima facie case stage." *Guarneri*, 205 F. Supp. 3d at 615 (citing *Cinelli v. U.S. Energy Partners*, 77 F. Supp. 2d 566, 576 (D.N.J. 1999)). In *Guarneri*, the defendants' allegations of plaintiff's poor job performance were "corroborated by a myriad of undisputed facts that show Plaintiff *objectively* failed to perform at a level that met Defendants' expectations."*Guarneri*, 205 F. Supp. 3d at 615.

Here, unlike in *Guarneri*, the evidence of Smith's job performance is disputed. M&M asserts Smith was objectively deficient in fulfilling his job responsibilities in three respects: the volume of customer complaints versus compliments, Smith's failure to ensure the delivery trucks had received proper maintenance, and Smith's failure to train drivers on the proper procedure for loading and unloading the delivery trucks. (ECF No. 13-2 at 19-20.) Smith has proffered evidence to create a factual dispute concerning each of the criteria cited by M&M.

First, with respect to the volume of customer complaints and compliments, Smith testified that the Trenton Store was by far M&M's largest location thereby skewing its gross number of customer complaints. (ECF No. 13-14, Ex. B at 96:1-99:20.) Additionally, Smith has adduced evidence demonstrating that drivers from other M&M locations were improperly soliciting

compliments, thereby affecting the Trenton Store's complaint to compliment ratio in relation to such ratios of other M&M locations. (ECF No. 15-12, Ex. H.)[12] Second, M&M's evidence concerning Smith's alleged failure to ensure proper maintenance of the delivery trucks consists exclusively of Tucker's own deposition and declaration. (ECF No. 13-13, Ex. A at 35:4-35:6; ECF No. 13-3 ¶ 17.) M&M contends Tucker observed Smith failed to ensure trucks undergo oil changes every 5,000 miles – in violation of company policy – and allow trucks to be on the road with damaged windshields, but provides no documentation supporting Tucker's allegation. (ECF No. 15-2 at 19-20.) As such, M&M has only "provide[d] mere allegations" that Smith's performance was inadequate, and such allegations are "inadequate . . . to defeat [a] discrimination claim at the prima facie case stage." *Guarneri*, 205 F. Supp. 3d at 615 (citation omitted). Third, relying on Tucker's declaration, M&M alleges Smith failed to train drivers on the correct procedures for unloading and loading donations from trucks. (ECF No. 13-2 at 20; ECF No. 13-3 ¶ 16.) However, Tucker also testified he had no reasons to believe that Smith failed to hold such trainings. (ECF No. 13-13, Ex. A at 54:7-20.) Indeed, Tucker's own, contradictory statements create a factual dispute regarding Smith's performance. Accordingly, this Court is satisfied that Smith has presented a *prima facie* case of age discrimination.

As Smith has demonstrated a *prima facie* case of age discrimination under the NJLAD, the burden then shifts to M&M to "'articulate a legitimate, nondiscriminatory reason for the prohibited conduct.'" *Jakimas*, 485 F.3d at 785 (citing *DiFederico*, 201 F.3d at 205). Although M&M

---

[12] Moreover, Smith highlights that M&M provided only "records showing customer complaints and compliments for a limited time period that does not extend through [] Smith's termination." (ECF No. 15-2 at 11.) Smith contends despite M&M's insistence that tracking customer complaints is of the "utmost importance," there was "no evidence provided regarding the number of complaints during the final five months of [] Smith's employment, which would necessarily be the most important months for observing his performance" for the purpose of determining whether Smith's performance was indeed unsatisfactory. (*Id.*)

provided legitimate reasons for Smith's termination, Smith has adduced evidence from which a reasonable factfinder could either disbelieve the employer's articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Zive*, 867 A.2d at 1144. Therefore, summary judgment in favor of M&M is unwarranted.

In its moving papers, M&M cites only two grounds for Smith's termination: the lack of "noticeable sustained improvement" in Smith's performance – and the performance of the Trenton Store generally – following M&M's "ongoing efforts to provide the necessary training and support to Smith," and Smith's alleged insubordination by virtue of the comments he made about Williams, one of his direct superiors. (ECF No. 13-2 at 21-22.) These reasons constitute legitimate, nondiscriminatory grounds for Smith's termination, however, Smith has proffered sufficient evidence demonstrating these grounds were merely pretextual such that a reasonable factfinder could discount M&M's articulated justification as ostensible and conclude that invidious discrimination was more likely than not a determinative cause of its employment decision. *See Zive*, 867 A.2d at 1144.

"A plaintiff may demonstrate pretext in summary judgment in two different ways." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 430 (3d Cir. 2013). "First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason." *Id.* (citing *Fuentes*, 32 F.3d at 764). "Second, the plaintiff may also defeat summary judgment by pointing to evidence that indicated that the employer acted with discriminatory animus." *Id.* at 430-31 (citing *Fuentes*, 32 F.3d at 764). A plaintiff need not do both. *Burton*, 707 F.3d at 431. In analyzing a plaintiff's claim that a defendant's grounds for termination are merely

ostensible, factors for the court to consider include the timing of the termination, any antagonism displayed by the defendant towards the plaintiff, and any inconsistencies in the defendant's position as to reasons for the plaintiff's termination. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000) (citing *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)).

The reasons M&M has provided in justifying its termination of Smith have varied over time. For instance, M&M now claims Smith's insubordination was a significant motivating factor leading to his termination, however, the Separation Notice makes absolutely no mention of Smith's incident with Williams despite providing space for Tucker to provide a narrative explaining M&M's decision. (ECF No. 13-11, Ex. H.) Indeed, the record provides no indication that Smith was informed that the alleged insubordination was a ground for his termination until sometime after this litigation was instituted. *See Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001) (holding "[i]f a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext.") Additionally, while Smith was initially informed only that his inadequate performance was the reason for his termination, the record demonstrates Smith was never informed that his job was in jeopardy or that he would likely be subject to any discipline due to his unsatisfactory fulfillment of his job responsibilities. (ECF No. 13-13, Ex. A at 48:9-49:14.) These inconsistencies cast sufficient doubt on M&M's proffered grounds for Smith's termination from which a reasonable factfinder could conclude they were pretextual and that there was some other, more nefarious justification for M&M's decision.

Moreover, Tucker's "dinosaur" comment demonstrates antagonism towards Smith.

Although it was a single instance and arguably innocuous, the Third Circuit has held that a supervisor's statements are relevant to demonstrate the culture of a work environment in which employment decisions are made, and as such, may be used to build a circumstantial case of discrimination. *See Brewer v. Quaker State Oil Ref'g Co.*, 72 F.3d 326, 333-34 (3d Cir. 1995) (a supervisor's statement referencing the plaintiff's age as "another problem" was relevant to show the corporate culture in which a company makes its employment decision and may be used to build a circumstantial case of discrimination thereby rendering summary judgment for the defendant inappropriate); *see also Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995) (holding that discriminatory statements made by non-decision makers may properly be used to build a circumstantial case of age discrimination). Here, Tucker was Smith's direct supervisor and arguably made the dinosaur comment in relation to Smith's job function merely weeks before Smith's termination.[13] Finally, the fact that M&M replaced Smith with a younger employee – albeit on an interim basis – creates a further indicia of age discrimination establishing Smith's circumstantial claims rendering summary judgment improper at this time.

M&M contends Smith cannot demonstrate its legitimate grounds for terminating him were pretextual as Smith was ultimately replaced with the fifty-seven-year-old Carmichael, who was hired before Smith brought this action, and the dinosaur comment was a "stray" remark unrelated to Smith's termination. (ECF No. 13-2 at 22-25.) First, although M&M claims to have ultimately filled the Trenton Store Transportation Supervisor role with someone of similar age to Smith – both were fifty-seven at the time of hiring – this does not adequately rebut Smith's circumstantial case so as to compel this Court to grant M&M's summary judgment motion. Smith was

---

[13] Like in *Brewer* and *Abrams*, Smith has not demonstrated Tucker's dinosaur comment constitutes direct evidence of discrimination, but may introduce this comment to build a circumstantial case of age discrimination.

immediately replaced with someone significantly younger than him, which raises factual issues concerning M&M's motivations. Second, M&M's contention that Tucker's dinosaur remark was "unrelated to Smith's termination" does not find definitive support in the record. (ECF No. 13-2 at 24.)[14] Indeed, Smith contends Tucker made the remark to suggest Smith was incapable of using and understanding new technologies being implemented by M&M, which were thus relevant to his job performance. (ECF No. 13-14, Ex. B at 5:22-9:24.) Regardless, the context and meaning of the alleged comment remain disputed facts, as does any relationship the potential animus contained therein may bear to the M&M's justifications for terminating Smith.

As Smith has demonstrated a *prima facie* case of age discrimination and has proffered sufficient evidence of pretext to create a genuine issue of material fact concerning M&M's asserted, legitimate grounds for his termination, Smith may prove his case using circumstantial evidence under the framework established in *McDonnell Douglas*. Accordingly, M&M's Motion for Summary Judgment is **DENIED**.

---

[14] M&M cites *Perry v Prudential-Bache Secs., Inc.*, 738 F. Supp. 843, 853 n.5 (D.N.J. 1989) in support of its argument that off-hand comments do not create an inference of intentional discrimination. This case is distinguishable from *Perry*, where the issue of ageist comments was merely peripheral. The *Perry* court held that a supervisor's reference to the plaintiff as "burned out and forgetful," made in anger after plaintiff missed a deadline, did not constitute circumstantial evidence of age discrimination. *Id.* at 851-53. However, the evidence must be viewed in the totality of the circumstances. Unlike here, the defendant in *Perry* tendered several legitimate grounds justifying the plaintiff's termination which he could not adequately dispute, including evidence of the plaintiff's improper management of expense accounts, refusal to follow company guidelines, lack of profitability, and strained relationship with his supervisor, with whom he was "not on speaking terms." *Id.* at 847.

## V.    Conclusion

For the reasons set forth above, M&M's Motion for Summary Judgment is **DENIED**.


**Date: March 28, 2019**                              */s/ Brian R. Martinotti*
                                                      **HON. BRIAN R. MARTINOTTI**
                                                      **UNITED STATES DISTRICT JUDGE**